# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) **ROPER HARRIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. 22-CV-187-RAW-KEW** |
| (2) **McCURTAIN COUNTY JAIL TRUST,** ) | |
| ) | |
| (3) **BOARD OF COUNTY** ) | |
| **COMMISSIONERS OF McCURTAIN** ) | |
| **COUNTY, OKLAHOMA,** ) | |
| ) | |
| (4) **SCOTT McCLAIN, individually** ) | **JURY TRIAL DEMANDED** |
| **and in his official capacity as McCurtain** ) | **ATTORNEY LIEN CLAIMED** |
| **County Jail Administrator;** ) | |
| ) | |
| (5) **KEVIN CLARDY, individually and in** ) | |
| **and in his official capacity as McCurtain** ) | |
| **County Sheriff; and** ) | |
| ) | |
| (6) **RICHARD WILLIAMSON;** ) | |
| ) | |
| (7) **ALICIA MANNING;** ) | |
| ) | |
| (8) **BRANDON STANSBURY;** ) | |
| ) | |
| (9) **JOE EBERT; and** ) | |
| ) | |
| (10) **CODY JOHNSON;** ) | |
| **in their official and individual capacities,** ) | |
| ) | |
| **Defendants.** ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Roper Harris ("Harris" or "Plaintiff"), for his action against Defendants McCurtain County Jail Trust ("MCJT"), the Board of County Commissioners of McCurtain County, Oklahoma ("BOCC"), McCurtain County Jail Administrator Scott McClain ("McClain"), McCurtain County Sheriff Kevin Clardy ("Clardy"), Deputy Richard Williamson ("Williamson"),

Deputy Alicia Manning ("Manning"), and McCurtain County Jail workers Brandon Stansbury ("Stansbury"), Joe Ebert ("Ebert"), and Cody Johnson ("Johnson", collectively "Defendants"), hereby alleges, or upon information and belief otherwise states, as follows:

PARTIES, JURISDICTION & VENUE

1. This action arises under 42 U.S.C. § 1983; the United States Constitution, Amendments IV and XIV; the Oklahoma Governmental Tort Claims Act ("GTCA"), OKLA. STAT. tit. 51 § 151 *et seq.*; and the Oklahoma Constitution.

**Roper Harris**

2. Plaintiff Roper Harris is a resident of the Town of Broken Bow, McCurtain County, State of Oklahoma.

3. The circumstances giving rise to the claims brought by Plaintiff herein took place on or about September 15, 2021, and September 16, 2021. Accordingly, pursuant to OKLA. STAT. tit. 51 § 156(B), Plaintiff had one year, or until September 15, 2022, to present his written notice of claim under the GTCA.

4. On or about September 29, 2021, Plaintiff submitted a *Notice of Claim* to the clerk of the McCurtain County Sheriff ("MCS") pursuant to OKLA. STAT. tit. 51 § 156(D).

5. Plaintiff's *Notice of Claim* was constructively denied on or about December 28, 2021.

6. The original *Complaint* **[Dkt. #2]** in the above-styled matter was filed on June 27, 2022 (the first day that the Clerk's Office was accessible after Sunday, June 26, 2022, *i.e.*, the 180th day following the constructive denial of Plaintiff's *Notice of Claim* submitted September 29, 2021).

7. Therefore, pursuant to OKLA. STAT. tit. 51 § 157(B) and FED.R.CIV.P. 6(a)(3)(A), this action was timely filed.

8. On or about September 8, 2022, pursuant to OKLA. STAT. tit. 51 § 156(D), Plaintiff submitted a supplemental *Notice of Claim* to the clerk of the McCurtain County Jail Trust and the clerk of the Board of County Commissioners of McCurtain County, Oklahoma.

9. To the extent that Plaintiff's September 2021 *Notice of Claim* did not name MCJT and/or BOCC, or otherwise failed to adequately notify MCJT and/or BOCC of Plaintiff's claim in accordance with the requirements of OKLA. STAT. tit. 51 § 156, such deficiency was cured by way of Plaintiff's supplemental *Notice of Claim* (which, having been submitted on or about September 8, 2022 – *i.e.*, prior to the one-year presentation deadline of September 15, 2022 -- was timely pursuant to OKLA. STAT. tit. 51 § 156(B)).

10. With respect to Plaintiff's supplemental *Notice of Claim*, the date of constructive denial is December 7, 2022.

11. Accordingly, with respect to Plaintiff's tort-based, state law claims against MCS and its individual employees who were acting within the scope of their employment (which stem from the conduct referenced in the *Notice of Claim* submitted on September 29, 2021), Plaintiff has exhausted all administrative remedies.

12. Likewise, with respect to Plaintiff's tort-based, state law claims against MCJT (which stem from the conduct referenced in the supplemental *Notice of Claim* submitted on or about September 8, 2022), all of Plaintiff's administrative remedies will have been exhausted as of December 7, 2022.

**McCurtain County Jail Trust**

13. The McCurtain County Jail Trust is a public trust organized under OKLA. STAT. tit. 60 § 176 *et seq.*

14. MCJT employs the staff at the McCurtain County Jail. ("MCJ")

15. MCJT is responsible for the operational aspects of MCJ, including the training and supervision of MCJ staff.

16. MCJT is liable under state law for the actions of its employees under a theory of *respondeat superior* consistent with the common law principles set forth by the Oklahoma Supreme Court in *Baker v. Saint Francis Hosp.*, 126 P.3d 602, made applicable to MCJT here pursuant to the decision of the Oklahoma Supreme Court in *Bosh v. Cherokee County Governmental Building Authority*, 305 P.3d 994 (Okla. 2013).

17. Pursuant to Art. VI, ¶ 1 of the *Trust Indenture Creating the McCurtain County Jail Trust* (the "Trust Indenture"), which was filed with the McCurtain County Clerk on August 31, 1998, and duly recorded in Book 622, Page 467, "[t]he purposes of [MCJT] are," *inter alia*:

    > To assist the Beneficiary … in making the most efficient use of all of their economic resources and powers in accord with the needs and benefit of the State of Oklahoma and the Beneficiary … specifically including, but not limited to, the power … to own, operate and manage jails, prisons, correctional and related facilities. . .

18. In turn, under Art. III of the Trust Indenture, the designated "Beneficiary" is McCurtain County, "acting by and through its Board of County Commissioners."

19. Pursuant to Art. VII, ¶ 12 of the Trust Indenture, "[t]he Trustees [of MCJT] serve at the pleasure of," and "may be removed at will" by, "the appointing County Commissioners" (*i.e.*, the three individuals who together comprise the Board of County Commissioners of McCurtain County, Oklahoma).

20. Pursuant to Art. VIII of the Trust Indenture, the Trustees of MCJT are empowered and have the duty, *inter alia*:

    > (1)  "To manage and conduct the business and affairs" of the MCJT;

    > \*   \*   \*

    > (3)  To "operate and maintain all necessary and convenient county correction and detention facilities";

(4) "To contract for employees, sufficient to maintain and operate the criminal justice facilities" of the MCJT; and

* * *

(10) "To do any and all other things necessary and proper in the management and operation of the [MCJT] for the purpose of promoting the establishment and maintenance of an effective corrections and detention system…"

21. At all times during which Plaintiff was detained, incarcerated, or otherwise held at MCJ, MCJT was responsible, *inter alia*, for providing medical supervision and services to Plaintiff, and/or for taking all reasonable steps to ensure that Plaintiff was afforded timely access to any necessary medical services.

22. At all times relevant hereto, MCJT was responsible, *inter alia*, for creating and implementing policies, practices, and protocols governing the provision of medical care to MCJ inmates and detainees, and for training and supervising MCJ workers in such regard.

23. At all times during which Plaintiff was detained, incarcerated, or otherwise held at MCJ, MCJT was responsible, *inter alia*, for overseeing Plaintiff's health and well-being, for preventing MCJ personnel from using constitutionally excessive force upon Plaintiff, for preventing Plaintiff from being subjected to any unjustifiably high risk of harm that was known and/or so obvious that it should have be known, and for responding reasonably in the face of any such force or risk.

**Kevin Clardy / McCurtain County**

24. Defendant Kevin Clardy is the Sheriff of McCurtain County, Oklahoma, residing in McCurtain County, Oklahoma, and at all times relevant hereto, acting under color of state law.

25. Plaintiff's claims for relief in this *Complaint* are brought, *inter alia*, against Clardy in his

official capacity as McCurtain County Sheriff.

26. "A claim against a government actor in his official capacity is essentially another way of pleading an action against the county … he represents." *Revilla v. Glanz*, 7 F.Supp.3d 1207, 1217 (N.D.Okla. 2014).

27. Thus, Plaintiff suing McCurtain County Sheriff Kevin Clardy is the functional equivalent of suing McCurtain County. *Id.*; *Moran v. Unknown Nurse #1*, 2015 WL 9593622 *1 (N.D.Okla.) (holding "a suit against the sheriff in his official capacity is the same as naming the county"); *Lynch v. Bd. of County Comm'rs of Muskogee Co.*, U.S. Dist. Ct. (E.D.Okla.) Case No. 16-CV-247-JHP, Dkt. #22, p. 9 (in which the Board of County Commissioners of Muskogee County expressly conceded that the Muskogee County Sheriff "does not enjoy a separate legal existence from Muskogee County").

28. McCurtain County "may be held liable for an act it has officially sanctioned, **or** for the actions of an official with final policymaking authority." *Revilla v. Glanz*, 7 F.Supp.3d 1207, 1217 (N.D.Okla. 2014). *See also Lynch v. Bd. of County Comm'rs of Muskogee Co.*, U.S. Dist. Ct. (E.D.Okla.) Case No. 16-CV-247-JHP, Dkt. #60, p. 3.

29. As McCurtain County Sheriff, Clardy is a county "official with final policymaking authority." *See id.* at 1218; *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995).

30. According to the official McCurtain County web page, as McCurtain County Sheriff, Clardy "[h]as [the[ power and authority to operate the County Jail." *See* https://mccurtain.okcounties.org/offices/county-sheriff.

31. Upon information and belief, pursuant to the provisions of Art. VII, ¶ 1 of the Trust Indenture, Clardy serves as Chairman of the MCJT Board of Trustees.

32. Further, as reported in the McCurtain Gazette on or about December 2, 2021:

In the recent interview, when asked about the jail trust, [McCurtain County Sheriff Kevin Clardy] said, by state law, the jail trust only manages financial aspects of the jail, [and] the sheriff does everything else.

"State law states the sheriff has full control of the jail and its employees. That's state law, but the jail trust is over all financial aspects of the jail," Clardy said.

"The jail trust is set up, in my opinion, not the way state law says it should be, but the way it went into effect by the vote of the people. The jail trust is over financial actions of the jail. It's set up that way. Always has been since 1998 when it went into effect."

33. The Board of County Commissioners of McCurtain County is the chief administrative body for McCurtain County (the "County"), a political subdivision of the State of Oklahoma, with its principal place of business located in the City of Idabel, McCurtain County, State of Oklahoma.

34. Pursuant to OKLA. STAT. tit. 57 § 41, "**Every county**, by authority of the board of county commissioners and at the expense of the county, **shall have a jail** or access to a jail in another county **for the safekeeping of prisoners** lawfully committed." (emphasis added).

35. McCurtain County must discharge its responsibilities to the McCurtain County Jail in a constitutional manner.

36. Thus, BOCC is obligated to conduct itself in a constitutional manner with respect to any actions that it takes and/or responsibilities it discharges pertaining to MCJ.[1]

37. Further, BOCC is obligated to conduct itself in a constitutional manner with respect to any actions that it takes and/or responsibilities it discharges through McCurtain County Sheriff

---

[1] In an abundance of caution, for the claims based on the constitutional violations to which Plaintiff was subjected while housed at the McCurtain County Jail, Plaintiff has named both the McCurtain County Jail Trust **and** McCurtain County, Oklahoma (*i.e.,* BOCC and MCS). In the event this Court determines that Plaintiff's constitutional claims against MCJT may not be simultaneously asserted against McCurtain County, then Plaintiff would request leave to file a curative amendment narrowing his claims against BOCC/MCS to focus solely upon the tortious and unconstitutional acts occurring outside MCJ and/or committed by non-jail personnel.

personnel.

38. At all times during which Plaintiff was in the legal custody of MCS (*i.e.*, during and immediately following the arrest of Plaintiff by MCS), the County was responsible, *inter alia*, for preventing MCS personnel from using constitutionally excessive force upon Plaintiff, and for ensuring that any MCS personnel who present for and/or participated in the arrest of Plaintiff took reasonable steps to protect Plaintiff from being subjected to constitutionally unreasonable/excessive force at the hands of any other law enforcement officer(s).

39. At all times during which Plaintiff was detained, incarcerated, or otherwise being held at MCJ,  the County was, *inter alia*, ultimately responsible for ensuring that that Plaintiff was afforded timely access to any necessary medical services.

40. At all times relevant hereto, the County was responsible, *inter alia*, for supervising MCJT's creation and implementation of policies, practices, and protocols governing the provision of medical care to MCJ inmates and detainees, and for ensuring that MCJT was properly training and supervising its employees in such regard.

41. At all times during which Plaintiff was detained, incarcerated, or otherwise being held at MCJ,  the County was responsible, *inter alia*, for ensuring that MCJT was preventing (or taking all reasonable steps in an effort to prevent) jail personnel from using constitutionally unreasonable/excessive force upon Plaintiff, protecting Plaintiff from being subjected to an unjustifiably high risk of harm that was known to jail personnel (or so obvious to them that it should have been known), and responding reasonably in the face of any such force or risk.

42. Pursuant to the prior rulings of this Court, BOCC is properly named in this lawsuit.

43. For example, in *Lynch v. Bd. of County Comm'rs of Muskogee Co.*, U.S. Dist. Ct. (E.D.Okla.) Case No. 16-CV-247-JHP, this Court held:

> [T]he sufficiency of any allegations against Muskogee BOCC are subject to the same analysis as if the allegations had been made against the Muskogee County Sheriff in his official capacity. *See Gilbreath v. Cleveland Co. Bd. of Co. Comm'rs*, 2012 WL 2683133 *8 (W.D.Okla.) (holding that "the sufficiency of the allegations against [the county sheriff] in his official capacity is subject to the same analysis as applicable to the Board [of County Commissioners]," and denying motion to dismiss § 1983 claim "based on an unconstitutional policy or practice"); *citing Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010); *Moran v. Unknown Nurse #1*, 2015 WL 9593622 *1 (N.D.Okla.) (holding "a suit against the sheriff in his official capacity if the same as naming the county").

In its *Motion*, Muskogee BOCC argues that "in order for Plaintiffs to prevail on their § 1983 claims against the Board, they must show that an official policy or established custom of the Board caused the alleged constitutional rights violation." [Dkt. #22, p. 4 (emphasis in original)] In *Du Bois v. Board of County Comm'rs of Mayes Co., Okla.*, 2014 WL 4810332 (N. D. Okla.), however, the court rejected the same argument now made by Muskogee BOCC, holding:

> This Court's reading of *Meade* does not support BOCC's argument [that it is not a proper party to be sued under § 1983] because the facts in *Meade* are different than those presented here. In *Meade,* the plaintiff did not name the board of county commissioners*, but named three individual Oklahoma County Commissioners as defendants. The plaintiff sought to hold the sheriff and those commissioners liable in their individual capacities under a theory of supervisory liability. In analyzing those claims, the Tenth Circuit held that, while the sheriff could be held individually liable in his supervisory capacity on the evidence presented, the commissioners could not be held liable for the deputies' alleged use of excessive force, because the board of county commissioners had no duty under Oklahoma law to hire, train, supervise, or discipline the county sheriffs or their deputies. In short, because the commissioners acting on the board had no responsibility for supervising and training deputies in the use of force, the commissioners could not be held liable individually under a supervisor liability theory.
>
> While *Meade* would generally preclude a plaintiff from suing commissioners in their individual capacities for actions of sheriff's deputies, the court's holding in that case does not preclude a plaintiff from bringing a § 1983 municipal liability action against a county. This reading of *Meade* is plain on its face and is consistent with the numerous Supreme Court and Tenth Circuit decisions that treat § 1983 official capacity claims and claims against a county, in the name of its board of county commissioners, as suits against the county. Both types of suits are analyzed

under the *Monell* framework, which requires the existence of a county policy that was the moving force behind a violation of federal rights.

The Court acknowledges that some state and federal decisions in Oklahoma have indicated that a board of county commissioners is not a proper defendant with respect to allegations against a county sheriff on civil rights claims arising out of incidents at a county jail. These cases rely in part upon *Meade* which, as noted, involved a suit against individual commissioners, as opposed to claims against a county, sued in the name of the board.

In addition, the Court does not believe the foregoing authorities -- which rely in part upon ... an extension of *Meade* that appears inconsistent with its actual holding -- can be reconciled with other decisions of the Tenth Circuit and the Supreme Court, which plainly establish that a policy of a county sheriff in his final policymaking capacity is a county policy, such that a county may be sued under § 1983 so long as such policy was the moving force behind a constitutional violation.

*Id.* at **6-7 (emphasis in original; internal citations omitted). Muskogee BOCC has itself admitted that "the Sheriff's Department does not enjoy a separate legal existence from Muskogee County." [Dkt. #22, p. 9]

Here, **Plaintiffs' § 1983 claims implicate Muskogee County because they deal, in part, with the unconstitutional policies and practices of the Muskogee County Sheriff** [*see, e.g.,* Dkt. #3-2, p. 11, ¶¶ 81-82; *see also* ¶ V, *infra*] -- a county official with "final policymaking authority." **Therefore, the Court finds that <u>it was statutorily proper for Plaintiffs to name Muskogee BOCC as a defendant, and that <u>dismissal under Fed.R.Civ.P. 12(b)(6) based on an "improper party" argument would be inappropriate.</u>** *See* 19 O.S. § 4 (providing that "[i]n all suits or proceedings … against a county, the name in which a county shall … be sued shall be, 'Board of County Commissioners of the County of ___'"); *DuBois*, 2014 WL 4810332 at **6-7 (holding that "[u]nder Oklahoma law, claims against a county must be brought by naming the board of county commissioners of that county").

*See Order* [Dkt. #60] in Case No. 16-CV-247-JHP (E.D. Okla., March 31, 2017), pp. 4-6

(emphasis added).

### MCJ Administrator Scott McClain

44. Defendant Scott McClain is, upon information and belief, a resident of McCurtain County, Oklahoma.

45. At all times relevant hereto, McClain worked at MCJ and held the position of Administrator.

46. Upon information and belief, and except as alternatively pled herein[2], at all times relevant hereto, McClain was acting within the scope of his employment as MCJ Administrator.

47. At all times relevant hereto, McClain was responsible, *inter alia*, for overseeing Harris' health and well-being, for assuring the Harris' medical/health needs were met, for preventing Harris from being subjected to constitutionally unreasonable/excessive force, for preventing Harris from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

**Richard Williamson**

48. Defendant Richard Williamson is, upon information and belief, a resident of McCurtain County, Oklahoma.

49. At all times relevant hereto, Williamson held the position of Deputy with MCS, and carried out the duties of such position (in whole or in part).

50. Upon information and belief, and except as alternatively pled herein, at all times relevant hereto, Williamson was acting within the scope of his employment as a Deputy with MCS.

51. During the time of the events upon which Plaintiff's claims for relief are based, Williamson was, *inter alia*, prohibited from using constitutionally unreasonable/excessive force upon Plaintiff, and obligated to take reasonable steps to prevent any other officer from using, or continuing to use, constitutionally unreasonable/excessive force upon Plaintiff in his

---

[2]    It is axiomatic that a plaintiff may properly plead alternative, hypothetical, and/or inconsistent claims and theories of relief. FED.R.CIV.P. 8(d)(2) & (3).

presence (to the extent Williamson had a sufficient opportunity to observe such behavior and to intervene).

**Alicia Manning**

52. Defendant Alicia Manning is, upon information and belief, a resident of McCurtain County, Oklahoma.

53. At all times relevant hereto, Manning held the position of Investigator with MCS, and carried out the duties of such position (in whole or in part).

54. Alternatively, at all times relevant hereto, Manning held the position of Captain with MCS, and carried out the duties of such position (in whole or in part).

55. Upon information and belief, and except as alternatively pled herein, at all times relevant hereto, Manning was acting within the scope of her employment as a Deputy and/or Captain with MCS.

56. During the time of the events upon which Plaintiff's claims for relief are based, Manning was, *inter alia*, prohibited from using constitutionally unreasonable/excessive force upon Plaintiff, and obligated to take reasonable steps to prevent any other officer from using, or continuing to use, constitutionally unreasonable/excessive force upon Plaintiff in her presence (to the extent Manning had a sufficient opportunity to observe such behavior and to intervene).

**Brandon Stansbury**

57. Defendant Brandon Stansbury is, upon information and belief, a resident of McCurtain County, Oklahoma.

58. At all times relevant hereto, Stansbury worked at MCJ as a jailer/detention officer.

59. Upon information and belief, and except as alternatively pled herein, at all times relevant

hereto, Stansbury was acting within the scope of his employment as a jailer/detention officer at MCJ.

60. During the time of the events upon which Plaintiff's claims for relief are based, Stansbury was partially responsible, *inter alia*, for overseeing Harris' health and well-being, for assuring the Harris' medical/health needs were met, for preventing Harris from being subjected to constitutionally unreasonable/excessive force, for preventing Harris from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

**Joe Ebert**

61. Defendant Joe Ebert is, upon information and belief, a resident of McCurtain County, Oklahoma.

62. At all times relevant hereto, Ebert worked at MCJ as a jailer/detention officer.

63. Upon information and belief, and except as alternatively pled herein, at all times relevant hereto, Ebert was acting within the scope of his employment as a jailer/detention officer at MCJ.

64. During the time of the events upon which Plaintiff's claims for relief are based, Ebert was partially responsible, *inter alia*, for overseeing Harris' health and well-being, for assuring the Harris' medical/health needs were met, for preventing Harris from being subjected to constitutionally unreasonable/excessive force, for preventing Harris from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

**Cody Johnson**

65. Defendant Cody Johnson is, upon information and belief, a resident of McCurtain County,

Oklahoma.

66. At all times relevant hereto, Johnson worked at MCJ as a jailer/detention officer.

67. Upon information and belief, and except as alternatively pled herein, at all times relevant hereto, Johnson was acting within the scope of his employment as a jailer/detention officer at MCJ.

68. During the time of the events upon which Plaintiff's claims for relief are based, Johnson was partially responsible, *inter alia*, for overseeing Harris' health and well-being, for assuring the Harris' medical/health needs were met, for preventing Harris from being subjected to constitutionally unreasonable/excessive force, for preventing Harris from being subjected to any unjustifiably high risk of harm that is known and/or so obvious that it should be known, and for responding reasonably in the face of any such risk.

69. Upon information and belief, Defendants McClain, Clardy, Williamson, Manning, Stansbury, Ebert, and Johnson personally participated in the constitutional deprivations set forth by Plaintiff hereinbelow.

70. As such, Plaintiff is permitted to pursue claims under 42 U.S.C. § 1983 against each such Defendant in his or her capacity as an individual. *See generally Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976).

71. In addition, or in the alternative, to the allegations below that Defendants McClain, Clardy, Williamson, Manning, Stansbury, Ebert, and Johnson were acting under color of state law, such Defendants, or any them, acted outside the scope of his/her/their employment in by engaging in willful, wanton, intentional, malicious, and/or bad faith conduct that was a proximate cause of Harris suffering physical injury and/or mental distress, the worsening of his condition, and other harms for which damages may be recoverable.

72. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. §1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

73. The jurisdiction of this Court is also invoked under 28 U.S.C. §1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

74. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

75. Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## FACTS

76. On September 15, 2021, at approximately 8:30 p.m., Defendants Kevin Clardy, Richard Williamson, and Alicia Manning arrested Plaintiff Roper Harris at his place of residence, 100 Oakwood Drive, Apt. #34 in Broken Bow, Oklahoma.

77. Defendants Clardy, Williamson, and Manning restrained Plaintiff by cuffing his wrists behind his back.

78. After handcuffing Harris, and despite the fact that Harris was not exhibiting any physical (or otherwise meaningful) resistance, Clardy, Williamson, and Manning used constitutionally unreasonable, excessive, and unnecessary force upon Harris and/or knowingly permitted the use of such force.

79. Among other things, Defendants Clardy, Williamson, and Manning forcibly yanked and shoved Plaintiff down a high, steep flight of stairs (outside Plaintiff's second-story apartment) in an exceedingly rough and dangerous manner intended to cause Plaintiff to lose his balance, fall, and suffer injury.

80. Immediately thereafter, despite the fact that Plaintiff was securely handcuffed and posing no resistance, Defendants Clardy, Williamson, and Manning, Manning (or, alternatively, any one or combination of them) unnecessarily and without provocation violently threw Harris down, slamming him face-first into the concrete sidewalk.

81. The use of force upon Plaintiff by Defendants Clardy, Williamson, and Manning was not a good faith effort to restrain Plaintiff or otherwise to maintain control of him.

82. Additionally or alternatively, the use of force upon Plaintiff by Defendants Clardy, Williamson, and Manning was done maliciously, sadistically, and/or or the very purpose of causing harm to Plaintiff.

83. Defendants Clardy, Williamson, and Manning, or any of them, knew or should have known that the excessive physical force used against Plaintiff would result in Plaintiff suffering serious harm.

84. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, Plaintiff was not exhibiting any meaningful physical resistance to said Defendants.

85. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, Plaintiff was restrained to such a degree that even if Plaintiff wanted to, he was physically incapable of meaningfully resisting said Defendants.

86. At the time Defendants Clardy, Williamson, and Manning used excessive physical force

on Plaintiff, there was no need for the application of such force.

87. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, Plaintiff posed no threat whatsoever to said Defendants' safety.

88. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, said Defendants did not reasonably perceive Plaintiff as posing some threat warranting the application of force.

89. Defendants Clardy, Williamson, and Manning made no effort to temper the severity of the force they employed.

90. Plaintiff unnecessarily suffered pain and injury as a result of the force used by Defendants Clardy, Williamson, and Manning.

91. In using force against Plaintiff as set forth above, Defendants Clardy, Williamson, and Manning were acting under color of state law in furtherance of assigned duties.

92. Each of the above-described acts in which Defendants Clardy, Williamson, and/or Manning engaged were incidental to some service being performed for his or her employer.

93. Alternatively, each of the above-described acts in which Defendants Clardy, Williamson, and/or Manning engaged arose out of an emotional response to actions being taken for his or her employer.

94. Additionally and/or alternatively, Clardy, Williamson, and/or Manning -- each keenly aware that the force being employed was excessive, and despite ample opportunity -- failed to intervene to prevent and/or stop each other from using excessive and unreasonable force upon Harris.

95. Following Harris' arrival at the McCurtain County Jail the evening of September 15th, and until Harris' release the following day at approximately 12:26 p.m., Scott McClain (whose

stepdaughter, Chelsea Fuller, is the mother of Harris' minor child), Brandson Stansbury, Joe Ebert, Cody Johnson, and/or other McCurtain County Jail workers who are presently unidentified:

(a)     themselves used constitutionally unreasonable, excessive, and unnecessary force upon Harris;

(b)     enlisted, encouraged, and permitted other jail inmates (including Jordan Bryant and Kolby Watson) to physically attack and beat Harris without cause or provocation on the part of Harris;

(c)     failed to intervene to prevent and/or stop the attack(s) upon Harris by other inmates and/or the use of unreasonable force by other McCurtain County Jail workers; and/or

(d)     failed to provide medical attention and/or refused to permit the timely administration thereof after Harris communicated his need for such attention and/or after the McCurtain County Jail workers (including, without limitation, those named above) knew, or should have known, that Harris was in need of medical attention.

96.    Additionally or alternatively, the use of force upon Harris by the above-identified individuals, or any of them, was neither a good faith effort to restrain Harris nor necessary to maintain control of Harris, and/or such individuals, or any of them, engaged in the above-described conduct maliciously, sadistically, for the very purpose of causing harm to Harris, and/or knowing that such conduct would result in Harris suffering serious harm.

97.    MCS has a long-standing culture and practice of disregarding its written policies.

98.    Likewise, MCJT has a long-standing culture and practice of disregarding its written

policies.

99. MCS has a history of permitting its personnel to engage in unnecessary, unreasonable and excessive force on arrestees who pose no threat.

100. Likewise, MCJT has a history of permitting its personnel to engage in unnecessary, unreasonable and excessive force on MCJ detainees, inmates, and other prisoners who pose no threat. **[*See* ¶¶ 172 - 182, *infra*]**

101. MCS also has a long-standing culture, practice, and history of training and/or permitting its law enforcement officers to maintain secrecy and/or to falsify reports regarding such abuses.

102. Similarly, MCJT has a long-standing culture, practice, and history of training and/or permitting MCJ personnel to maintain secrecy, to abuse MCJ detainees and inmates in the "blind spots" of the jail (*i.e.*, those areas over which there is no camera surveillance), and/or to falsify reports regarding such abuses.

103. MCJT has a long-standing culture, practice, and history of deliberate indifference toward the serious medical needs of MCJ inmates, detainees, and other prisoners (*e.g.,* delaying, denying, or otherwise interfering with the treatment of an inmate's serious medical needs despite being aware that such conduct would likely expose the inmate to a substantial risk of serious harm).

104. The failure of Defendants MCJT, McClain, Stansbury, Ebert, and Johnson to take reasonable measures to guarantee Harris's safety and well-being described hereinabove -- including their deliberate indifference to Harris's serious medical needs, their deliberate decision to expose Harris to the substantial risk of being brutally assaulted by homicidal and/or violent inmates (a risk which was significantly exacerbated by Harris' obviously

weakened state following the unprovoked use of constitutionally excessive force upon him), the failure to train and/or supervise MCJ jailers/detention officers, and/or their use of constitutionally-excessive force -- proximately caused Harris to endure physical and mental pain and suffering, the worsening of his condition, and other injuries and harms for which damages are recoverable.

105. The above-summarized acts and omissions were in furtherance of, and consistent with, the policies, customs, and practices that the McCurtain County Jail Trust and McCurtain County Sheriff had previously created, implemented, observed, maintained, and/or tolerated (or in which MCJT and MCS had otherwise previously acquiesced).

106. Whether formal or informal, the above-referenced policies, customs, and practices of the McCurtain County Sheriff (*i.e.*, McCurtain County) and the McCurtain County Jail Trust were well-settled and permanent.

107. These prior instances of unconstitutional mistreatment put BOCC and MCJT on notice that MCJ administrators, supervisors, detention officers, medical staff, and/or other personnel were inadequately trained, that MCJ detention workers subjected inmates to unnecessary and constitutionally-excessive force, and that the medical care and inmate supervision provided by MCJ workers was wholly inadequate, thus placing inmates like Harris at excessive risk of harm.

108. BOCC and MCJT, however, in deliberate indifference to the rights of pretrial detainees like Harris, failed to alleviate the above-referenced risks, which were known and obvious.


**FIRST CAUSE OF ACTION:**
**UNLAWFUL USE OF EXCESSIVE FORCE**
**IN VIOLATION OF U.S. CONST. AMEND. IV**
**(42 U.S.C. § 1983)**

For his First Cause of Action, Plaintiff re-alleges and incorporates by reference all of the

foregoing paragraphs, and further states:

109. The use of force on Plaintiff by Defendants Clardy, Williamson, and Manning was not a good faith effort to restrain Plaintiff or otherwise to maintain control.

110. Additionally or alternatively, said Defendants' use of force on Plaintiff was done maliciously, sadistically, and/or or the very purpose of causing harm to Plaintiff.

111. Defendants Clardy, Williamson, and Manning, or any of them, knew or should have known that the excessive physical force used against Plaintiff would result in Plaintiff suffering serious harm.

112. At the time said Defendants used excessive physical force on Plaintiff, Plaintiff was not exhibiting any meaningful physical resistance to Defendants.

113. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, Plaintiff was restrained to such a degree that he was physically incapable of meaningfully resisting said Defendants.

114. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, there was no need for the application of such force.

115. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, the threat to said Defendants' safety posed by Plaintiff was minimal or nonexistent.

116. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, Defendants did not reasonably perceive Plaintiff as posing some threat warranting the application of force.

117. Said Defendants' effort to temper the severity of a forceful response was grossly inadequate.

118.  Plaintiff unnecessarily suffered pain and injury as a direct and proximate result of the force used by Defendants Clardy, Williamson, and Manning.

119.  In using force against Plaintiff as set forth above, Defendants Clardy, Williamson, and Manning were acting under color of state law.

120.  The acts by each of the three above-referenced Defendants were incidental to some service being performed for his or her employer.

121.  Alternatively, the acts by each of the three above-referenced Defendants arose out of an emotional response to actions being taken for his or her employer.

    **WHEREFORE**, for his First Cause of Action, Plaintiff Roper Harris prays that this Court enter judgment in his favor and against Defendants Kevin Clardy, Richard Williamson, and Alicia Manning, and that it award Plaintiff all available pecuniary and non-economic damages in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case.  Plaintiff also prays for punitive damages against Defendants Clardy, Williamson, and Manning, prejudgment interest, the recovery from said Defendants of all attorney fees and costs reasonably incurred by Plaintiff in his prosecution of this action, and an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that this Court deems just and proper.

### SECOND CAUSE OF ACTION:
### FAILURE TO INTERVENE
### TO PREVENT OR STOP THE USE OF EXCESSIVE FORCE
### IN VIOLATION OF U.S. CONST. AMEND. IV
### (42 U.S.C. § 1983)

    For his Second Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

122.  Defendants Clardy, Williamson, and Manning, or any of them, were present at the time

excessive physical force was being used against Plaintiff by MCS personnel.

123. Defendants Clardy, Williamson, and Manning, or any of them, observed or were otherwise aware of the excessive physical force being used against Plaintiff by MCS personnel.

124. Defendants Clardy, Williamson, and Manning, or any of them, had a reasonable opportunity to intervene to prevent or stop the excessive physical force from being used against Plaintiff by MCS personnel.

125. Defendants Clardy, Williamson, and Manning, or any of them, failed to intervene to prevent or stop the excessive physical force from being used against Plaintiff by MCS personnel.

126. Plaintiff unnecessarily suffered pain and injury as a result of the aforementioned failure to intervene on the part of Clardy, Williamson, and/or Manning.

**WHEREFORE**, for his Second Cause of Action, Plaintiff Roper Harris prays that this Court enter judgment in his favor and against Defendants Kevin Clardy, Richard Williamson, and Alicia Manning, and that it award Plaintiff all available pecuniary and non-economic damages in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for punitive damages against Defendants Clardy, Williamson, and Manning, prejudgment interest, the recovery from said Defendants of all attorney fees and costs reasonably incurred by Plaintiff in his prosecution of this action, and an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that this Court deems just and proper.

### THIRD CAUSE OF ACTION:
### FAILURE TO ADEQUATELY TRAIN, SUPERVISE, AND/OR CONTROL
### LAW ENFORCEMENT PERSONNEL
### (42 U.S.C. § 1983)

For his Third Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states upon information and belief:

127. Defendants Williamson and Manning, or either of them, exceeded constitutional limitations on the use of force against Plaintiff.

128. The above-referenced use of force arose under circumstances that constitute one of the usual and recurring situations with which law enforcement officers (including MCS personnel) must deal.

129. Defendants Clardy (in his official capacity as McCurtain County Sheriff) and BOCC failed to exercise reasonable care in the training of MCS personnel regarding the use of force and the constitutional limitations imposed thereupon.

130. The failure by Defendants Clardy and BOCC to train MCS personnel regarding excessive force amounts to deliberate indifference to the rights of persons with whom the untrained law enforcement officers of MCS come into contact.

131. Defendants Clardy (in his official capacity as McCurtain County Sheriff) and BOCC failed to exercise reasonable care in the training of MCS personnel regarding the use of force and the constitutional limitations imposed thereupon.

132. The failure by Defendants Clardy and BOCC to adequately train MCS personnel regarding the use of force and the constitutional limitations imposed thereupon amounts to deliberate indifference to the rights of persons with whom the untrained law enforcement personnel of MCS come into contact.

133. Defendant Williamson's supervisor(s) had contemporaneous knowledge of the offending incident and/or had knowledge of a prior pattern of similar incidents.

134. Defendant Manning's supervisor(s) had contemporaneous knowledge of the offending

incident and/or had knowledge of a prior pattern of similar incidents.

135. There is a direct and causal link between the injuries and pain unnecessarily suffered by Plaintiff and the failure of Defendants BOCC and Clardy (in his official capacity as McCurtain County Sheriff) to adequately train MCS law enforcement personnel, including as alleged above.

136. There is a direct and causal link between the injuries and pain unnecessarily suffered by Plaintiff and the failure of Defendants BOCC and Clardy (in his official capacity as McCurtain County Sheriff) to adequately supervise MCS law enforcement personnel, including as alleged above.

137. There exists a pattern of similar constitutional violations by the untrained and/or unsupervised MCS law enforcement personnel.

138. Defendants BOCC and Clardy (in his official capacity as McCurtain County Sheriff) had actual and/or constructive notice that their actions and/or failures to act, as described herein, were substantially certain to result in a constitutional violation.

139. Nevertheless, Defendants BOCC and Clardy (in his official capacity as McCurtain County Sheriff) consciously or deliberately chose to disregard the risk of harm.

**WHEREFORE**, for his Third Cause of Action, Plaintiff Roper Harris prays that this Court enter judgment in his favor and against Defendants Kevin Clardy (in his official capacity as McCurtain County Sheriff only) and the Board of County Commissions of McCurtain County, Oklahoma, and that it award Plaintiff all available pecuniary and non-economic damages in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for prejudgment interest, the recovery from said Defendants of all attorney fees and costs reasonably incurred by Plaintiff

in his prosecution of this action, and an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that this Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS OF PRETRIAL DETAINEE**
**IN VIOLATION OF U.S. CONST. AMEND. XIV**
**(42 U.S.C. § 1983)**

For his Fourth Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

140.  Defendants McClain, Stansbury, Ebert, and Johnson had an obligation to meet Harris' objective medical needs in a timely fashion.

141.  Specifically, the **written** policies and procedures addressing inmate medical care and treatment (by which MCJ administrators and personnel **claim** to be governed) provide, in pertinent part:

### 6.01 – MEDICAL SERVICES POLICY

All McCurtain County Jail inmates shall be entitled to health care comparable to that available to citizens in the surrounding community. Medical care at the facility shall be delivered under the direction of a licensed physician and through the use of trained health care personnel. **No Detention Officer or other employee will <u>ever</u> summarily or arbitrarily deny an inmate's request for medical services.**

\*    \*    \*

### 6.03 – EMERGENCY MEDICAL CARE

POLICY

Emergency Medical Services are available twenty-four (24) hours a day to inmates of the McCurtain County Jail **to insure prompt emergency medical attention**. All detention officers are trained to respond to medical emergencies since an inmate's life may depend on quick action.

PROCEDURE

1.  Emergency Definition: Any of the following occurrences shall constitute an emergency, and their presence will initiate the Emergency Medical Care Plan.

a. **Severe bleeding**
b. **Unconsciousness**
c. Serious Breathing Difficulties
d. **Head Injury**
e. Severe Burns
f. **Severe Pain**
g. Suicide Attempt
h. Sudden Onset of Bizarre Behavior
i. **Health o[r] Life Threatening Situations**

2. Notification:  The Detention Officer confronted with a medical emergency will:

   a. Immediately notify the Ranking Officer on duty and request assistance in administering first aid.
   b. Request the Control Tower Officer to call the Facility Nurse, if on the premises, in accordance with the Emergency Medical Care Plan that follows, or contact the McCurtain County EMS.

\* \* \*

3. Isolation:  When possible, the Detention Officer shall move the inmate to the holding cell or remove other inmates from the scene…

4. First Aid:  All Detention Officers are instructed in First Aid…

5. Emergency Instructions:  The Shift Supervisor or Facility Nurse will relay to the Control Tower Officer of Communications instructions to:

   a. Contact the EMS Unit to transport the inmate to the McCurtain Memorial Hospital.
   b. Transport to the McCurtain Memorial Hospital.
   c. Treat at the facility in accordance with medical orders from the Facility Physician.

\* \* \*

7. Records:  The Detention Officer initially responding to the emergency shall file an incident report as well as the Shift Supervisor.

## EMERGENCY MEDICAL CARE PLAN

1. **BE AWARE THAT AN EMERGENCY CAN OCCUR** AT ANY TIME.
2. **BE READY TO OBSERVE** OR BE NOTIFIED OF AN EMERGENCY.
3. **FIRST AID MUST BE GIVEN IMMEDIATELY**.
4. **CONTACT THE FACILITY NURSE** IF ON THE PREMISES, IF NOT, CALL OR PAGE THE FACILITY NURSE

5. **NOTIFY THE SHIFT SUPERVISIOR**, WHO WILL TAKE CHARGE OR DESIGNATRE A CONTROL STATION TO DO SO.

**6.04 – NON-EMERGENCY CARE AND DAILY MEDICAL COMPLAINTS**

\*   \*   \*

<u>PROCEDURE</u>

\*   \*   \*

2. Requests:  **Inmate requests for medical care <u>shall be documented</u>** on the Inmate Sick Call slip.  The slips shall be provided by a Detention Officer upon request and shall be collected by a Detention Officer and placed in with the Sick Call Log and given to the Shift Supervisor, whom delivers the log on to the Administrator, whom delivers the log on to the Facility Nurse.

142. Defendants McClain, Stansbury, Ebert, and Johnson (who had the opportunity to observe Harris while he was detained at MCJ, who were responsible for such observation, and/or who came into direct contact with Harris), as described herein, knew that delays in treating Harris's serious medical needs, and/or the denial of any such treatment, would likely expose Harris to a substantial risk of serious harm.

143. Such knowledge on the part of Defendants McClain, Stansbury, Ebert, and Johnson resulted from their awareness of, *inter alia*:

a. Stansbury and Ebert's completely unprovoked and unnecessary use of force against Roper (which included shooting Harris' eye with a pepper ball projectile at extreme close range) in what they knew to be a "blind spot" that was not monitored and could not be seen by MCJ's security cameras;

b. The brutal physical assault upon Harris by MCJ inmates Kolby Watson and Jordan Bryant (which was coordinated by, and carried out at the express direction of, McClain and Stansbury prior to Harris being formally booked into MCJ, leaving Harris bloody, bruised, limp, blinded / unable to see, and unconscious/semi-conscious); and

c. Harris' obvious, severe injuries, his outward display of extreme pain, and his repeated requests for medical attention, which McClain, Stansbury, Ebert, Johnson, and the other jail personnel ignored.

144. As detailed hereinabove, given the outward manifestation of his injuries and distress, Harris' medical needs were so obvious to Defendants McClain, Stansbury, Ebert, and Johnson that even a lay person would have easily recognized the necessity for a doctor's attention.

145. Indeed, Harris' urgent need for medical attention was so undeniable and obvious that when McCurtain County District Attorney Mark Matloff saw Harris' condition on September 16th, he was compelled to intervene, demanding that Harris be released and taken to the hospital immediately, and proclaiming, "Why is there a 19-year-old beaten up in here with no medical attention?"

146. Even after being released, it remained obvious that Harris had been beaten up and severe damage had been done to his eyes:



147. The regular practice of Stansbury, Ebert, Johnson, and other MCJ personnel (which was not only permitted, but also expressly encouraged by Jail Administrator Scott McClain and

MCS Kevin Clardy) was to **disregard** MCJ's written policies and procedures (including, without limitation, the above-quoted provisions of § 6.01, 6.03 & 6.04).

148. As detailed hereinabove, Defendants McClain, Stansbury, Ebert, and Johnson -- intentionally and/or despite their knowledge of a substantial risk of serious harm -- denied and/or delayed Harris's access to medical care, failed to take reasonable measures to abate the substantial risk of harm known to them, knowingly engaged in conduct (including the conduct specifically described herein) that they knew would have an extraordinarily high likelihood of exacerbating Harris' injuries, and/or otherwise failed to act.

149. In particular, despite the **written** policies and procedures purportedly governing inmate medical care at MCJ, the above-named Defendants:

    a. Summarily and arbitrarily denied Harris' repeated requests for medical services;

    b. Failed to render first aid immediately (or to administer any medical attention whatsoever);

    c. Ignored the fact that at least four of the conditions that Harris was clearly exhibiting (*i.e.*, severe bleeding, unconsciousness, head injury, and severe pain) -- all of which the above-named Defendants observed or about which they were otherwise aware -- **each** qualified as an "emergency" medical condition under MCJ's written policies;

    d. Failed to notify the shift supervisor or EMS of Harris' emergency medical condition;

    e. Failed to isolate Harris from other inmates (including the two who MCJ personnel specifically tasked with violently assaulting Harris); and

    f. Did not fully or accurately document the events giving rise to Harris' injuries, or the actions MCJ personnel took (or failed to take) in response to those injuries.

150. Given their knowledge of the substantial risk of serious harm, the above-referenced actions

and failures on the part of the Defendants McClain, Stansbury, Ebert, and Johnson amount to more than an ordinary lack of care or simple negligence.

151. The above-described acts and omissions on the part of Defendants McClain, Stansbury, Ebert, and Johnson -- including their failure to meet Harris's objective medical needs, their delay in meeting such needs, their unprovoked and unnecessary use of constitutionally excessive force upon Harris, their failure to take reasonable measures to abate substantial risks to Harris' safety (about which these Defendants knew and were keenly aware), and their active encouragement and facilitation of violent, physical attacks upon Harris that Defendants believed would injure Harris and/or exacerbate his other recent injuries -- directly and proximately caused Harris to suffer substantial harm.

152. The above-described acts and omissions on the part of Defendants McClain, Stansbury, Ebert, and Johnson -- including their failure to meet Harris's objective medical needs, their delay in meeting such needs, their unprovoked and unnecessary use of constitutionally excessive force upon Harris, their failure to take reasonable measures to abate substantial risks to Harris' safety (about which these Defendants knew and were keenly aware), and their active encouragement and facilitation of violent, physical attacks upon Harris that Defendants believed would injure Harris and/or exacerbate his other recent injuries -- amounted to the deprivation of Harris's constitutional rights.

153. Plaintiff, therefore, is entitled to recover pecuniary and compensatory damages.

154. Additionally or alternatively, by denying and/or delaying Harris's access to medical care, using constitutionally excessive force upon Harris (which was neither provoked nor otherwise necessary), failing to take reasonable measures to abate known, substantial risks to Harris' safety, and by actively facilitating violent, physical attacks upon Harris by other

inmates (which Defendants McClain, Stansbury, Ebert, and Johnson believed were likely to injure Harris and/or to exacerbate his other recent injuries), said Defendants acted maliciously, sadistically, and/or for the very purpose of causing harm to Harris.

**WHEREFORE**, for his Fourth Cause of Action, Plaintiff Roper Harris prays that this Court enter judgment in his favor and against Defendants Scott McClain, Brandon Stansbury, Joe Ebert, and Cody Johnson, and that it award Plaintiff all available pecuniary and non-economic damages in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for punitive damages against Defendants McClain, Stansbury, Ebert, and Johnson, prejudgment interest, the recovery from said Defendants of all attorney fees and costs reasonably incurred by Plaintiff in his prosecution of this action, and an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that this Court deems just and proper.

### FIFTH CAUSE OF ACTION
### DELIBERATE INDIFFERENCE TO HEALTH AND SAFETY OF PRETRIAL DETAINEE IN VIOLATION OF U.S. CONST. AMEND. XIV
### (42 U.S.C. § 1983)

For his Fifth Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

155. Defendants McClain, Stansbury, Ebert, and Johnson (who observed Harris remotely, who were responsible for such observation, who came into direct contact with Harris, and/or who were responsible for selecting the cell into which Harris would be placed) had an obligation to take reasonable measures to guarantee Harris's safety.

156. The above-referenced obligation included a duty to protect Harris from violence at the hands of other prisoners, including Jordan Bryant and Kolby Watson.

157. Specifically, pursuant to § 2.11 MCJ's **written** policies and procedures (addressing the "Surveillance of Holding Cells"):

> [W]hen inmates are placed in holding cells during the admission process, … such inmates will be given more frequent surveillance.
>
> \* \* \*
>
> 2. Frequency of Surveillance: The Booking Officer will visually observe each holding cell at least once every sixty (60) minutes, unless otherwise instructed.
>
> 3. Separation and Increase Frequency: If the Booking Officer suspects that an inmate may be … assaultive or in need of medical observation, the Booking Officer shall:
>
> \* \* \*
>
> c. Place the assaultive inmate in a holding cell separate from others being held.
>
> d. Observe the holding cell every fifteen (15) minutes or more frequency if necessary.
>
> 4. Documentation: Visual Sight Checks of holding cells shall be documented when completed.

158. The regular practice of Stansbury, Ebert, and Johnson (which was not only permitted, but also expressly encouraged by Jail Administrator Scott McClain and MCS Kevin Clardy) was to **disregard** MCJ's written policies and procedures (including, without limitation, the above-quoted provisions of § 2.11).

159. Such was the case here.

160. Specifically, prior to Harris being booked, Defendants McClain, Stansbury, Ebert, and Johnson caused Harris to be placed into the same cell as Jordan Bryant and Kolby Watson, and/or permitted Bryant and Watson to remain in the same cell as Harris, for approximately nine (9) hours with significantly **decreased** observation, despite knowing that Bryant and Watson -- in addition their long history of engaging in violent behavior on their own accord -- had been directed, or otherwise planned, to violently assault Harris.

161. In so doing, the individual Defendants subjected Harris to conditions that were intended to

cause, clearly posed a substantial and unjustifiably high risk of, and ultimately resulted in serious harm to Harris.

162. At the time the above-named Defendants planned and coordinated the assault upon Harris by inmates Jordan Bryant and Kolby Watson, such Defendants were aware:

a. That "jail-related offenses were the top category of crime worked by sheriff's deputies … [including] fights in the jail" (as later reported in the McCurtain Gazette);

b. That Bryant was being held on a $4,000,000.00 bond in Case No. CF-2021-64, in which he was charged with murder in the second degree;

c. That Watson had spent over 3½ years in prison on various felony convictions (Oklahoma Dept. of Corrections Inmate No. 755860);

d. That Watson had an extensive criminal history, which in McCurtain County alone:

   (i) included at least five (5) felony matters (*i.e.*, CF-2014-38, CF-2019-287, CF-2021-164, CF-2021-171, and CF-2020-57, the latter of which was violent and resulted in Watson being held on a bond of $100,000.00);

   (ii) resulted in the issuance of a victim protective order pursuant to 22 O.S. § 60.1 *et seq.* (in PO-2012-88);

   (iii) included at least six (6) misdemeanors, three of which involved violent acts -- namely, two separate charges for aggravated assault and battery (in CM-2012-186 and CM-2013-7, to which Watson's incarceration at MCJ in September 2021 was attributable) and a charge for resisting an officer (in CM-2019-486);

   (iv) included Watson:

      (a) violently attacking MCS Deputy John Jones;

      (b) repeatedly threatening to murder Jones and his family;

(c) fighting and struggling with jail personnel (such that six law enforcement officers were needed in order to get Watson fastened into a restraint chair); and

(d) having to be placed in isolation due to the physical threat he posed to deputies, detention officers, and other MCJ inmates.

163. Defendants McClain, Stansbury, Ebert, and Johnson were aware of facts (including, without limitation, Stansbury and Ebert's initial, unprovoked, and unnecessary assault upon Harris; the need to protect Harris from any further physical trauma (due, *inter alia*, to his battered and weakened state, urgent need for medical attention, and inability to protect himself); the specific directive given to inmates Jordan Bryant and Kolby Watson to violently attack Harris; and Bryant and Watson's history of violence and their ability and willingness to carry out such an attack) from which such Defendants knew, or could have drawn the inference, that housing Harris in the same cell as Bryant and Watson would almost certainly pose a substantial risk of serious harm to Harris.

164. Upon information and belief, and in light of the circumstances described hereinabove, Defendants McClain, Stansbury, Ebert, and Johnson did, in fact, intend, know, or otherwise draw the inference, that housing Harris in the same cell as Bryant and Watson would pose a substantial risk of serious harm to Harris.

165. Defendants McClain, Stansbury, Ebert, and Johnson -- in the face of an unjustifiably high risk of harm to Harris that they had previously planned and/or that was known or otherwise obvious to them -- consciously and/or recklessly disregarded this substantial risk of serious harm by placing Harris into the same cell as Bryant and Watson, by permitting Bryant and Watson to remain in the same cell as Harris, and/or by failing to separate Harris from

Bryant and Watson or otherwise to intervene.

166. Additionally or alternatively, in placing Harris into the same cell as Bryant and Watson, permitting Bryant and Watson to remain in the same cell as Harris, and/or failing to separate Harris from Bryant and Watson or otherwise to intervene), Defendants McClain, Stansbury, Ebert, and Johnson acted maliciously, sadistically, and/or for the very purpose of causing harm to Harris.

**WHEREFORE**, for his Fifth Cause of Action, Plaintiff Roper Harris prays that this Court enter judgment in his favor and against Defendants Scott McClain, Brandon Stansbury, Joe Ebert, and Cody Johnson, and that it award Plaintiff all available pecuniary and non-economic damages in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for punitive damages against Defendants McClain, Stansbury, Ebert, and Johnson, prejudgment interest, the recovery from said Defendants of all attorney fees and costs reasonably incurred by Plaintiff in his prosecution of this action, and an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that this Court deems just and proper.

### SIXTH CAUSE OF ACTION
#### USE OF EXCESSIVE FORCE AGAINST PRETRIAL DETAINEE IN VIOLATION OF U.S. CONST. AMEND. XIV (42 U.S.C. § 1983)

For his Sixth Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

167. At the time of the events upon which Plaintiff's claims are based, Harris, as a pretrial detainee, had a clearly-established constitutional right under the Fourteenth Amendment to be secure in his person and free from objectively unreasonable and/or excessive force.

168. Any reasonable officer knew or should have known of Harris's above-referenced rights at the time of the events upon which Plaintiff's claims are based, as such rights were clearly established.

169. At the time the violent physical force was used by Defendants Stansbury, Ebert, and/or one or more unidentified MCJ workers, Harris posed no threat or serious physical harm to himself or others, and violent force was unnecessary to restrain Harris or to secure the safety of Stansbury, Ebert, or anyone else.

170. Accounting for the "legitimate interests [stemming from the government's] need to manage the facility in which the individual is detained, the violent force used on Harris was objectively excessive, constitutionally unreasonable, and disproportionate to any legitimate interest in managing MCJ.

171. The excessive force described herein was a direct and proximate cause of Harris's unnecessary physical pain, his emergent physical injuries, the worsening of his condition, the severe emotional distress and mental anguish he suffered, and the hospital, surgical, and other medical expenses he incurred.

**WHEREFORE**, for his Sixth Cause of Action, Plaintiff Roper Harris prays that this Court enter judgment in his favor and against Defendants Brandon Stansbury and Joe Ebert, and that it award Plaintiff all available pecuniary and non-economic damages in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for punitive damages against Defendants Stansbury and Ebert, prejudgment interest, the recovery from said Defendants of all attorney fees and costs reasonably incurred by Plaintiff in his prosecution of this action, and an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that this Court deems

just and proper.

## SEVENTH CAUSE OF ACTION
### *MONELL* LIABILITY FOR CONSTITUTIONAL VIOLATIONS
### (42 U.S.C. § 1983)

For his Seventh Cause of Action, Plaintiff re-alleges and incorporates by reference all of the foregoing paragraphs, and further states:

172.  The above-referenced constitutional violations to which Harris was subjected were in furtherance of, consistent with, and causally connected to the policies, customs, and practices that MCS/McCurtain County and/or MCJT had previously created, implemented, observed, maintained, and/or tolerated (or in which MCS/McCurtain County and/or MCJT had otherwise previously acquiesced).

173.  Such policies, customs, and/or practices include those specifically set forth or otherwise described in prior filings with this Court.

174.  For example, a civil rights lawsuit was filed against the McCurtain County Jail Trust and the Board of Commissioners of McCurtain County, Oklahoma, on behalf of inmate Corey Carter, now deceased. **[*See* Case No. 16-CIV-008-JHP]** The *First Amended Complaint* filed in that case, which described facts and circumstances that bear a striking similarity to many of those in the case at bar, stated the following:

> This action involves excessive force, deliberate indifference, and failure to train staff at the McCurtain County Detention Center ("MCDC"). The acts and omissions described below are the direct and proximate cause of the injuries sustained by Corey Carter that led to his wrongful death on February 13, 2015. This action includes claims for the deprivation of rights secured by the Fourth and Fourteenth Amendments to the U.S. Constitution, actionable through 42 U.S.C. § 1983, and for deprivations of Art. 2, §§ 7, 30 of the Oklahoma Constitution…
>
> \*   \*   \*
>
> 2.  MCCURTAIN COUNTY JAIL TRUST ("MCJT") is a public trust organized under Title 60 of Oklahoma statutes. The MCJT employs the staff at the

MCDC. …

3. The BOARD OF COUNTY COMMISSIONERS FOR MCCURTAIN COUNTY, OKLAHOMA ("BOARD") is the legislative entity with non-delegable statutory responsible for providing a jail facility for McCurtain County, Oklahoma that is adequate for the safe-keeping of inmates. *See* 57 O.S. § 41. The Authority section of the MCDC policy and procedure section explicitly identifies BOARD and the MCJT as "the sole authorities for the daily operation of the McCurtain County Jail and its employees."

4. CARL HALL ("HALL"), HARRY FLOWERS ("FLOWERS"), ROBERT BILLY ("BILLY"), ROBERT PURCELL ("PURCELL"), WES NICHOLSON ("NICHOLSON"), CHAD DALE ("DALE"), ROBERT CAVINDER ("CAVINDER"), AND JONATHON HILL ("HILL") are or were employees of the MCJT working at the MCDC on February 12,2015, and at all times were acting under color and authority of state law.

* * *

6. On February 12, 2015 at approximately 15:55 hours, records indicate that MCDC jailers PURCELL and BILLY booked CARTER into the facility.

7. At the time of booking, CARTER had a long-standing mental health diagnosis. PURCELL and BILLY knew about CARTER'S mental health status from his Medical Questionnaire that BILLY prepared and signed at 16:04 hours. In response to the question, "Does Inmate appear to have psychiatric problems?" BILLY checked "Yes" with the explanation "CANNOT COMPLETE MEDICAL QUESTIONARE[sic]." Each of the forty-six (46) questions on the two-page Medical Questionnaire includes a checkmark giving the appearance that the Questionnaire was completed in fact.

8. At 20:14 hours, records indicate that McCurtain County EMS received a dispatch call from the MCDC. The caller referenced an arrestee who was exhibiting a shallow pulse after being "tased." Approximately five minutes later, McCurtain County EMS received a second call from the MCDC. This time, the caller reported that the arrestee had no pulse at all. An ambulance was dispatched.

9. Upon arrival, paramedics found CARTER unresponsive, pulseless and apneic. EMS records indicate that "*Bystander CPR in progress*."

10. The history reported to first responders in the EMS records does not include any reference to a use of force incident, any physical struggle, strangulation, the use of a restraint chair, or the user of a Taser, and video from the MCDC does not show paramedics attempting any life-sustaining measures.

11. The paramedics loaded CARTER into the ambulance, and video from the MCDC shows that it sat idle at the facility for approximately ten minutes before finally leaving. According to EMS records, CARTER was in asystole in three leads. CARTER's eyes were non-reactive. At approximately 20:40 hours, the ambulance left the MCDC with CARTER en route to the McCurtain County Hospital. They arrived at approximately 20:45 hours.

12. Records from McCurtain County Hospital reflect a triage time of approximately 20:48 hours with a chief complaint identified as "*cardiac arrest*," "*collapsed*," and "*found unresponsive.*" The Physician's Clinical Report notes, "*The patient collapsed. Arrest was witnessed. Bystander performed CPR. Down time before CPR (2 minutes).*"

13. As with the EMS records, the hospital records do not reference a use of force incident, any physical struggle, strangulation or tactical neck hold, the use of a restraint chair, or the use of a Taser.

14. At approximately 21:15 hours, medical staff reestablished cardiac rhythm through mechanical ventilation. At 22:09 hours, medical staff performed a CT scan of the brain without contrast. The CT report revealed a possible "*anoxic brain injury*."

15. Anoxic brain injury is a medical term that describes damage following an inadequate supply of oxygen to the brain. When the supply of oxygen to the brain is significantly low, brain cells begin to die after approximately four minutes, and after five minutes, permanent anoxic brain injury can occur.

16. At approximately 22:5 hours, Air EMS transported CARTER for high-level care to Christus St. Michael hospital in Texarkana, TX. Medical providers continued efforts throughout the day but informed CARTER's family that he was brain dead.

17. Medical staff discontinued life-sustaining measures at approximately 19:15 hours on February 13, 2015. CARTER was pronounced dead at approximately 20:00 hours.

18. On February 17, 2015, the Oklahoma Department of Health, Jail Inspection Division received a Jail Incident Report ("Report") regarding the CARTER incident from MCJT administrator JASON LINCOLN. In the section requiring LINCOLN to identify the type of incident, he check, "*Unusual Incident*." LINCOLN reported the incident occurring at 20:00 hours on February 12, 2015. He described the incident as follows: "*Officers got into an altercation with Combative[sic] Inmate[sic] Corey Carter and administered the Taser to subdue the subject. After the altercation, inmate was unresponsive and Officers had to perform CPR on subject. Inmate was taking[sic] by EMS to McCurtain Memorial Hospital.*"

19. LINCOLN's description differs from and omits information communicated to the Medical Examiner by OSBI agent CHAD DANSBY.

20. DANSBY informed the Office of the Medical Examiner that during CARTER's change into "*jail attire,*" unidentified MCDC staff "dry stunned"[sic] CARTER "a couple of times" for being "*combative*," "*uncooperative*" and "*verbally abusive.*" Staff placed CARTER in a "*restraint chair*" and left. When MCDC staff returned, CARTER was "*not breathing.*"

21. A subsequent autopsy performed by the Office of the Medical Examiner also noted multiple blunt impact trauma to CARTER, including injuries to his abdomen, right elbow, right dorsal hand, right index finger, left forearm, left buttock, right knee, and contusions to the left elbow. Upon information and belief, the blunt force injuries are consistent with defensive wounds.

22. The autopsy also identified a hemorrhage of the left sternohyoid muscle located in the front of the neck.

23. Injury to the sternohyoid muscle is consistent with several difference mechanisms of injury, including: (1) manual strangulation where the assailant's hands are wrapped around the neck with a thumb depressed on the sternohyoid; or (2) an improper carotid or neck hold. Hemorrhage of the sternohyoid supports the inference that HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and/or CAVINDER applied sufficient force to the front of CARTER's neck to cause a rupture of the blood vessels.

24. The Medical Examiner listed the manner of CARTER's death as "unknown," with the cause identified as anoxic encephalopathy, or brain death, following a physical restraint and use of a Taser.

25. The Medical Examiner reported the "circumstances of death" as follows:

> Received for autopsy examination is the body of a 40 year-old man [*DOB omitted*] who reportedly became unresponsive at McCurtain County Jail after he experience electric shock weapon discharge and was placed in a restraint chair. The decedent was later pronounced deceased after being transferred to Saint Michael Hospital in Texarkana, Texas.

26. As detailed above, records indicate that CARTER suffered from a mental health condition that can impair his ability to listen to and follow commands.

27. Shortly after processing CARTER into MCDC, video shows PURCELL, BILLY and FLOWERS place CARTER into a restraint chair, ostensibly because CARTER did not want to change into jail clothing. CARTER initially

remained in the booking area, but is then moved to an isolation cell while still in the restraint cell.

28. A restraint chair is a use of force tool that tethers a person to a chair at multiple points including their wrists, ankles and chest. Use of the restraint chair is limited to situations involving combative arrestees, or for arrestees inclined to acts of self-harm. Upon information and belief, **use of the restraint chair violated the written policies at the MCDC**.

29. PURCELL, BILLY, and FLOWERS **left CARTER in the restraint chair just over two hours without interruption or medical checks.** FLOWERS, NICHOLSON, and BILLY then returned to isolation and let CARTER up from the restraint chair for less than two minutes. **CARTER was then returned to the restraint chair where he remained without interruption or medical check for just over an hour and a half.**

30. Upon information and belief, PURCELL, FLOWERS, NICHOLSON and BILLY **improperly punished CARTER disproportionate to the need** based upon his purported refusal to change into jail clothing by subjecting him to prolonged use of the restraint chair, and PURCELL, FLOWERS, NICHOLSON, and BILLY punished CARTER despite knowledge that he suffered from mental health issues that can impact his decision-making.

31. After nearly four hours in the restraint chair, HALL, FLOWERS, BILLY, DALE, NICHOLSON, and/or CAVINDER released CARTER from the restraint chair. Video from the isolation room shows CARTER having difficulty standing and trying to stretch as he gets up.

32. **HALL, BILLY, and DALE then <u>took CARTER off camera</u> into a change-out room** where they were joined near the threshold to the room by NICHOLSON, FLOWERS, and CAVINDER.

33. **Inside the change-out room, HALL, BILLY, and DALE, individually or collectively, <u>physically assaulted CARTER and cause numerous injuries</u>.** Video from the booking area briefly captured images of CARTER inside the change-out room with HALL, BILLY, and/or DALE having control of both his arms. HALL, BILLY, and/or DALE then appear to present a naked and hunched-over CARTER to FLOWERS, who is positioned at the threshold to the change-out room with his Taser at the ready. CARTER is then moved off camera as FLOWERS lunges into the change out room where he repeatedly shocks CARTER at least three times, including two applications in the vicinity of CARTER's chest. Upon information and belief, **use of the Taser violated the written policies at the MCDC.**

34. FLOWERS, NICHOLSON, CAVINDER, and HILL then join HALL, BILLY, and DALE inside the change-out room. Upon information and belief, **HALL,**

**BILLY, DALE, FLOWERS, NICHOLSON, HILL, and/or CAVINDER, individually and collectively, continue to physically assault CARTER inside the change-out room.** At some point, other arrestees can hear CARTER repeatedly pleading over and over again for someone to help him. Nobody responds.

35. Subsequent to the prolonged confinement in the restraint chair, after the physical assault, the strangulation, and the repeated use of the Taser near CARTER's chest cavity, CARTER's body goes completely limp while still inside the change-out room.

36. HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and CAVINDER have CARTER's naked body removed from the change-out room, but rather than check on his medical condition, HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and CAVINDER spend the next few minutes watching each other strap CARTER's flaccid extremities to the device**. There was no effort to medically assess CARTER or summon any medical personnel to address the obvious change in his condition.**

37. CARTER is then wheeled back inside the isolation room as HALL, BILLY, FLOWERS, NCHOLSON, DALE, HILL, and CAVINDER stand around variously observing CARTER's limp body for approximately eleven (11) minutes before initiating any life-saving measures. At one point while CARTER is lying incapacitated inside the isolation cell, video captured BILLY grinning and making several "punching" gestures as if he was reenacting the **physical assault on CARTER inside the change-out room**.

38. Upon information and belief, **CARTER sustain injuries** documented by the Medical Examiner from HALL, BILLY, FLOWERS, BICHOLSON, DALE, HILL, and/or CAVINDER **during one or more use of force events while off camera and inside the change-out room.**

39. Upon information and belief, the use of force events involved a combination of fists and feet to physically assault CARTER, the improper use of some mechanism to cause the sternothyroid injury, (e.g., manual strangulation or an improper carotid hold), and repeated shocks from a Taser.

40. Upon information and belief, HALL, BILLY, FLOWERS, NICHOLASON, DALE, HILL, and/or CAVINDER used these weapons and tactics on CARTER despite knowledge that diminished capacity can interfere with CARTER's ability to correctly or promptly follow commands, and despite the imminent danger and incapacity that accompanies the use of strangulation or neck holds, individually or in combination with other devices, like a Taser or prolonged use of a restraint chair.

41. Upon information and belief, **the combined force used** by HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and/or CAVINDER described above **was excessive and disproportionate to the amount of force that was safe or reasonably necessary under the totality of the circumstances**, and resulted either from conduct that violated policy and training, or alternatively, **was the direct and proximate result of a failure to adequately train**, or **resulted from** written policies or **unwritten practices** that permitted the improper and disproportionate use of [force and] tactical weapons … in an unsafe manner…

42. Upon information and belief, the decision to use this level and type of force on CARTER resulted from the training provided by the MCJT, which was deficient in the following particulars: … (4) the failure to adequately monitor and observe arrestees … who are subjected to multiple use of force tools; and (5) reliance on the Oklahoma Jail Standards and/or other inadequately trained staff members as a source of adequate use of force training …

43. Given the nature of operating a jail facility, i.e., knowledge that staff are authorized and expected to use force, … the need for more or different training on these particulars is so obvious that **MCJT's failure to provide adequate training on these topics predictably led to the excessive, inappropriate, or unsafe use of force on CARTER sufficient to result in a constitutional violation**.

44. Upon information and belief, **the decision by HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and/or CAVINDER to conceal the true extent of the force used on CARTER** – to EMS dispatch, the responding paramedics, and the Jail Inspection Division - **supports the reasonable inference that HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and/or CAVINDER consciously knew that the force used was excessive**.

45. Upon information and belief, HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, or/or CAVINDER were **indifferent to CARTER's condition and immediate medical needs following the use of force in the change-out room.** HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and/or CAVINDER **knew**, or it was **obvious to them**, that **CARTER was in need of immediate medical attention prior to leaving the change-out room**, and **despite that knowledge**, they placed CARTER back in the restraint chair **without any medical assessment or aid, with deliberate indifference to the consequences.**

46. Upon information and belief, the **failure to properly monitor and care for CARTER resulted from the training provided by the MCJT, which was deficient** in the following particulars: (1) a **failure to adequately train staff to assess and monitor an arrestee following a use of force incident** …; (2) a **failure to adequately train staff to timely recognize a medical need** and

initiate life-sustaining or life-saving techniques; (3) a **failure to train staff to fully and accurately report the entire scope of the force used** to first responders; and (4) reliance on the Oklahoma Jail Standards … and other inadequately trained staff as a source or substitute for adequate training to respond to emergent medical needs subsequent to a multifaceted use of force incident involving an arrestee ….

47. Given the nature of operating a jail facility, *i.e.*, knowledge that staff are authorized and expected to use force …, the need for more or different training on these particulars is so obvious that MCJT's failure to provide adequate training on these topics predictably resulted in a failure to respond to CARTER's emergent medical condition, or the timely initiation of adequate life-sustaining or life-saving measures.

\* \* \*

50. As detailed above, **the force used on CARTER was excessive, unsafe, and disproportionate to any need under the totality of the circumstances**, and further caused injury to the Estate's decedent for which HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and/or CAVINDER are liable under the Fourth and/or Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

## Deliberate Indifference
## 42 U.S.C. § 1983

54. As detailed above, HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and/or CAVINDER **had subjective knowledge that CARTER had an emergent medical condition that required immediate medical attention**, and **with indifference to the consequences**, HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and/or CAVINDER **either did nothing in response**, or **delayed doing anything that would reasonably or adequately respond to the medical condition confronting them**. As a direct and proximate result, CARTER suffered an anoxic brain injury that ultimately led to his death for which HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and/or CAVINDER are liable under the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

\* \* \*

56. As detailed above, … BOARD is liable to the ESTATE for the actions of the MCJT and HALL, BILLY, FLOWERS, NICHOLSON, DALE, HILL, and/or CAVINDER by failing to discharge its non-delegable statutory duty to provide a jail facility that is adequate for the safekeeping of prisoners, and pursuant to the supervisory authority vested by the MCDC policy and procedure manual.

## Failure to Train
## 42 U.S.C. § 1983

57. ESTATE hereby adopts and incorporates by reference each preceding paragraph as if fully set forth herein.

58. MCJT failed to provide training on subjects where the need for more or different training was so obvious that the failure to train was likely to result in a constitutional violation. **The specific training deficiencies detailed above are closely related to the ultimate injuries and damages suffered by the ESTATE such that the official practice or custom can be fairly [] described as both deliberately indifferent to CARTER's constutional rights, and the moving force behind his death**, for which MCJT is liable under the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. §1983.

### Procedural Due Process
### 42 U.S.C. § 1983

60. The placement of CARTER in the restraint chair for nearly four hours as a consequence for not wanting to change into jail attire is not rationally related to any legitimate nonpunitive purpose, or alternatively, the placement was excessive and disproportionate in relation to its purpose for which PURCELL, BILLY, and FLOWERS are liable under the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. §1983.

**[Case No. 16-CV-008-JHP, Dkt. #25, pp. 2-7, ¶¶ 2-4, 6-47, 50, 54, 56-58 & 60]**

175. In approximately October 2016, the defendants in *Carter v. McCurtain County Jail Trust, et al.* agreed to settle the case for $200,000.00.

176. In another civil rights lawsuit naming MCJT as a defendant **[see Case No. 14-CV-333-FHS]**, a brief filed on behalf of the plaintiff, Clyde Allen Rife, summarized his claims as follows:

> [Plaintiff Clyde] Rife encountered … deliberate indifference to his serious medical needs at the [McCurtain County] Jail.  For a many hours, Plaintiff endured prolonged, unnecessary and excruciating pain at the Jail.  According to Defendant Chad Dale, Mr. Rife "didn't know what was going on" and appeared to be "dazed and confused" during his entire contact with him.  When Mr. Rife was taken to his holding cell, on May 14, 2013, he "was making loud moaning and groaning noises", "was *obviously in pain*" and "kept saying that his stomach hurt…"  According to Mr. Rife's cellmate, Tim May, it was "***obvious* that Mr. Rife was in serious pain and needed medical attention.**"  During the course of the night of May 14, on several occasions, Mr. Rife complained to detention officers at the Jail that he was

in pain *and needed medical help*, but no one at the McCurtain County Jail did anything to help Mr. Rife. After being released from the Jail on the morning of May 15, having received no medical assistance whatsoever from anyone at the Jail, Mr. Rife had to be rushed to the hospital for emergent treatment of his life-threatening injuries, including a lacerated spleen, head trauma, and excessive internal bleeding.

It is undisputed that Defendant McCurtain County Jail Trust ("Jail Trust") operates, and makes policy for, the McCurtain County Jail. Under the Amended Complaint, Plaintiff's municipal liability claims are brought against the Jail Trust. As shown *infra*, there is significant evidence of a causal nexus between Mr. Rife's injuries and several Jail Trust policies or customs. In particular, there is evidence Mr. Rife suffered unnecessary pain due to the Jail Trust's unconstitutional (1) failure to train detention staff; (2) failure to supervise staff and inmates; (3) understaffing the Jail; and (4) failure to follow or enforce policies necessary to the safety of inmates.

**[*See* Case No. 14-CV-333-FHS, Dkt. #99, pp. 2-3 (internal citations to evidentiary record omitted)]**

177.   Another civil rights lawsuit was filed in this Court against the McCurtain County Jail by Andrew Harris, who complained that an MCS deputy physically assaulted him without provocation, following which that deputy and another deputy jointly engaged in an unconstitutionally excessive use of force. **[*See* Case No. CIV-12-143-RAW]**

178.   According to the *Civil Rights Complaint* filed in *Harris:*

Russell Miller of the McCurtain Co. Sherriff Dept. was bringing [me] back from Court [with] about 12 men. And I was asked to be quiet, but, I wasn't talking so, after getting out of the chains, he was pushing me. And I turned and told him to stop cause, the leg chains were still on. So he stop[ped] pushing me and [immediately] rammed me into the window. I was still in leg irons.

\*   \*   \*

First there was Mr. Miller, then Teri Best [came] from nowhere to assist. Throwed me in a chair. And that's [where] I stayed for 7 hours.

\*   \*   \*

[The] jailers … were rough enough [where] bones were broken. In my case, [they] caused me to suffer a] dislocated shoulder joint.

**[*See* Case No. CIV-12-143-RAW, Dkt. #1, pp. 3 & 7 ]**

179. In yet another civil rights lawsuit filed in this Court **[Case No. CIV-10-030-FHS]**, the

allegations against the McCurtain County Jail Trust were summarized as follows:

> Cheryl Stafford was taken into custody and placed in the McCurtain County Jail (the "Jail") on Friday, October 31, 2008. The charges for which she was arrested were later dismissed. Upon entering the jail, she informed the booking officer that she had high blood pressure, for which she took Lisinopril daily. She did not receive her first dose of Lisinopril until the next Tuesday, November 4, 2008. On at least one occasion thereafter she was given a medication which was not the one she was prescribed.
>
> While she was incarcerated, she began having headaches and dizziness. According to Ms. Stafford, she submitted numerous requests to see the nurse during that time. The Jail denies that, and says they have no requests for medical attention from Ms. Stafford. In violation of the Policies and Procedures for the Jail, Jason Lincoln, the Jail Administrator and a defendant in this case, discontinued the use of a Sick Call Log to document these requests. Without the Sick Call Log, there is no independent way to determine whether or not a request was ever submitted.
>
> On December 7, 2008, Cheryl Stafford suffered a ruptured aneurysm in her brain. She had to undergo a craniotomy, a removal of a portions of her skull, at which time the ruptured aneurysm was repaired, another aneurysm was found and clipped, and a third aneurysm was detected and evaluated. She is now totally disabled by the guidelines established by the Social Security Administration and receives $647.00 monthly in compensation, as well as $200.00 in food stamps. She must be monitored for growth in the remaining aneurysm, and suffers many other debilitating effects as a result of the aneurysms.
>
> *   *   *
>
> The United States Supreme Court has held that "the medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, and the temperature he is subjected to in his cell, and the protection he is afforded against other inmates." *Wilson v. Seiter*, 111 S.Ct. 2321, 2326, 501 U.S. 294, 303 (1991) (holding that the proper standard to apply in cases brought under the 8th Amendment, requiring a mental state on the officials, is "deliberate indifference.")
>
> The United States Supreme Court has also held that "deliberate indifference to serious medical needs of prisoner constitutes the 'unnecessary and wanton infliction of pain' proscribed in the 8th Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury sates a

cause of action under Section 1983." *Estelle v. Gamble*, 97 S.Ct. 285, 291, 429 U.S. 9, 104-5 (1976). *Internal citations omitted.*

\* \* \*

In this case, the Trust Board had a cascading abdication of responsibility, amounting to deliberate indifference, which led directly to Ms. Stafford's injuries. First, it hired an Administrator for the jail with no training, other than as a Detention Officer. Mr. Lincoln had no education after high school, had never worked before as a jail administrator. He was not even interviewed by the Trust Board before he was hired. As Mr. Lincoln recalls, they "told him what they expected of him." When asked, however, he could not recall what that was.

The only training Mr. Lincoln ever received -- training as a Detention Officer -- consisted of 24 hours of training upon hiring and once a year thereafter. The training included, as part of that 24 hours, first aid and CPR.

But the deliberate indifference of the Trust Board did not end with the hiring or training of Mr. Lincoln. They did not perform their fiduciary duty to ensure that the Jail was being administered properly. When asked about his responsibilities to the Board, Mr. Lincoln said he prepared neither written or oral reports on events at the jail, and did not review the minutes for accuracy before they were presented to the board for approval. The next Board meeting after Ms. Stafford's illness does not even mention her, and lasted a total of 8 minutes, including the prayer. …

The policy of the Jail is for inmates to receive a medical screening upon booking in. As part of that screening, the booking officer goes through a computer checklist with the inmate and also visually reviews the inmate's condition. The Jail nurse (an LPN) then reviews those screenings and determines if immediate medical attention is required. The problem, however, is that the Jail nurse is only on duty Monday through Friday from 8 to 4, although she remains on call at other times. Therefore, the initial determination of appropriate medical treatment, including medication, is determined by a non-medical professional. In Ms. Stafford's specific case, she was booked into the Jail after the nurse left on Friday afternoon. The nurse presumably reviewed her questionnaire when she arrived at the Jail on Monday. Ms. Stafford did not receive her first blood pressure medicine until Tuesday, making it five days since her last dose. **While the policy may say that "inmates are entitled to health care comparable to that available to citizens in the surrounding community," it is clear that the procedures in place do not accomplish that policy.**

The lack of oversight of the workings of the Jail, including attention to the medical needs of the inmates, and the failure to ensure that policies and procedures are followed, amounts to deliberate indifference on the part of the Trust Board.

**[*See* Case No. CIV-10-030-FHS, Dkt. #80, pp. 1, 2 & 6-9 (internal citations to evidentiary record omitted)]**

180. An Eighth Amendment deliberate indifference claim against the McCurtain County Jail was also brought by plaintiff James Burke. **[Case No. 09-CV-310-FHS]** Among other things, the *Amended Civil Rights Complaint* filed by Burke stated the following:

> Whe[n] I arrived at the McCurtain County Jail, I was not see[n] by medical for at least seven (7) or eight (8) days. … When I got put in blocks, there [were] a wide range of violations … [including] denial of access to mental health treatment from July 09 to October 09.

> The jail nurse did not screen me for over a week to see if I had any medical problems like high blood pressure, [vision] problems, bipolar, P.T.S.D., TB, low sugar [etc.] There were men in the jail that stay[ed] in [their] cell[s] with no water except the toilet. One man was see[n] drinking out of the toilet by three (3) of us inmates. It took me from July unti October to be seen by a doctor for bipolar and P.T.S.D. I was in much mental anguish, pain and suffering and was denied adequate mental and medical care.

**[Case No. 09-CV-310-FHS, Dkt. #60, pp. 3 & 7]**

181. On December 16, 2020, another civil rights action was filed against the McCurtain County Jail by inmate Eric Ray. **[Case No. CIV-20-471-RAW]** In his *Complaint*, Ray made the following allegations:

> 3. After being … imprisoned at the McCurtain County Jail, Plaintiff Ray was denied access to medical attention regarding the injuries that resulted from the … extradition that took place on December 13, 2018. Plaintiff notified jail nurse "Misty" multiple times of pain and passing of blood. **The nurse refused to aid Plaintiff or ever respond to this request for help.**

> 4. **McCurtain County Jail Administrator Russ Miller refused to protect Plaintiff Ray from being assaulted multiple times at the jail after being notified the jail was unsafe for Plaintiff.** The jail administrator removed the P.R.E.A. number from the jail phone system so Plaintiff Ray could not get help or notify authorities outside of the jail as to what was happening in the jail regarding the assaults [and] the lack of medical care[.]

**[Case No. CIV-20-471-RAW, Dkt. #1, pp, 14-15, ¶¶ 3 & 4]**

182. Whether formal or informal, the aforementioned policies, customs, and practices of MCS/McCurtain County and/or MCJT were well-settled and permanent at the time of the events upon which Plaintiff's claims are based.

183. Furthermore, the above-referenced constitutional violations to which Harris was subjected arose under circumstances that constitute usual and recurring situations with which MCS officers and/or MCJ administrators, supervisors, detention officers, medical staff, and other personnel must routinely deal and/or have regularly or previously dealt.

184. The **written** policies and procedures addressing the training of MCJ staff (by which MCJ administrators and personnel **claim** to operate and be governed) provide, in pertinent part:

### 1.06 – STAFF TRAINING

#### POLICY

… Supervision of the McCurtain County Jail's training program shall be the responsibility of the McCurtain County Jail Administrator.

The purpose of an in-service training program is to … insure that members have retained the skills necessary to perform their duties…

*   *   *

A new employee shall receive orientation and training prior to job assignment by the McCurtain County Jail.

a.  The Assistant Jail Administrator shall be responsible for the orientation of all new employees.
b.  Shift Supervisors shall be responsible for the training all new employees in specific job assignments prior to the assignment of a specific job assignment.

Any employee who works in direct contact with prisoners during the first year of their employment shall receive at least twenty-four (24) hours of training that covers at least the following:

a.  **Security procedures.**
b.  **Supervision of prisoners.**
c.  Report writing and documentation.
d.  Prisoner rules and regulations.
e.  Grievance and disciplinary

    f. **Rights and responsibilities of prisoners**
    g. **Emergency procedures**
    h. **First aid**
    i. **Requirement of the Oklahoma Jail Standards: Chapter 670**

185. In practice, however, and as set forth anecdotally hereinabove, MCS/McCurtain County and MCJT had a well-established custom of **disregarding** MCJ's written policies and procedures regarding the minimum training requirements for jail personnel (including, without limitation, the above-quoted provisions of § 1.06).

186. MCJT failed to adequately train, supervise, and/or control its administrators, supervisors, detention officers, medical staff, and other MCJ personnel regarding their obligations under the Eighth and Fourteenth Amendments to refrain acting with deliberate indifference toward the serious medical needs of MCJ inmates/detainees.

187. MCJT failed to adequately train, supervise, and/or control the administrators, supervisors, detention officers, and other MCJ personnel regarding their obligations under the Eighth and Fourteenth Amendments to protect prisoners, detainees, and other inmates from violence at the hands of other prisoners, detainees, and inmates.

188. MCS/McCurtain County and MCJT failed to adequately train, supervise, and/or control the law enforcement officers, administrators, supervisors, detention officers, and/or other personnel in their employ regarding the proper use of force and/or prohibitions against said personnel using constitutionally-excessive or unreasonable force on suspects, arrestees, detainees, and/or inmates.

189. The failure to adequately train, supervise, and/or control the law enforcement officers, administrators, supervisors, detention officers, medical staff, and/or other personnel in the employ of MCS or MCJT, as stated above, amounts to deliberate indifference to the rights of suspects, arrestees, detainees, and/or inmates.

190. A direct and causal link exists between the pain and injury unnecessarily suffered by Harris and the failure to adequately train the law enforcement officers, administrators, supervisors, detention officers, medical staff, and/or other personnel in the employ of MCS or MCJT.

191. A direct and causal link exists between the pain and injury unnecessarily suffered by Harris and the failure to adequately supervise the law enforcement officers, administrators, supervisors, detention officers, medical staff, and/or other personnel in the employ of MCS or MCJT.

192. Upon information and belief, MCS/BOCC and/or MCJT had contemporaneous knowledge of the above-referenced constitutional violations.

193. As detailed hereinabove, there exists a lengthy pattern of similar constitutional violations by the inadequately trained and/or inadequately supervised law enforcement officers, administrators, supervisors, detention officers, medical staff, and/or other personnel in the employ of MCS or MCJT.

194. MCS/BOCC and MCJT had actual and/or constructive notice that their actions and/or failures to act, as described herein, were substantially certain to result in the violation of the constitutional rights of the suspects and arrestees of MCS and/or MCJ detainees and inmates.

195. Moreover, given the above-described history of constitutional violations, which is lengthy and ongoing, the need to provide the law enforcement officers, administrators, supervisors, detention officers, medical staff, and/or other personnel in the employ of MCS and/or MCJT with more and/or different training was obvious to MCS/BOCC and/or MCJT, as was the likelihood that the aforementioned inadequacies would result in violations of the

constitutional rights of the suspects and arrestees of MCS and/or MCJ detainees and inmates.

196. Nevertheless, MCS/BOCC and MCJT consciously or deliberately chose to disregard the substantial risk of serious harm to the suspects and arrestees of MCS and/or MCJ detainees and inmates.

197. MCS/BOCC and MCJT, through its continued encouragement, ratification, approval, and/or maintenance of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to the health and safety of the suspects and arrestees of MCS and/or MCJ detainees and inmates, including Harris.

198. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Harris suffered injuries as alleged herein, entitling Plaintiff to recover damages.

**WHEREFORE**, for his Seventh Cause of Action, Plaintiff Roper Harris prays for judgment against Defendants McCurtain County Jail Trust and Board of County Commissioners of McCurtain County, Oklahoma for all available damages (including pecuniary and non-economic damages) in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for pre-judgment interest, attorney fees, and the costs of this action, to be taxed against said Defendants, along with an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that the Court deems just and proper.

### EIGHTH CAUSE OF ACTION:
### UNLAWFUL USE OF EXCESSIVE FORCE
### (OKLA. STAT. tit. § 151 *et seq.*)

For his Eighth Cause of Action, Plaintiff re-alleges and incorporates by reference all of the

foregoing paragraphs, and further states:

199. Defendants Clardy, Williamson, and Manning restrained Plaintiff by cuffing his wrists behind his back.

200. Despite the fact that Plaintiff was securely handcuffed and posing no resistance to Defendants Clardy, Williamson, and Manning, or any one or combination of them, unnecessarily and without provocation violently pushed or threw Harris to the concrete ground.

201. The use of force upon Plaintiff by Defendants Clardy, Williamson, and Manning was not a good faith effort to restrain Plaintiff or otherwise to maintain control.

202. Additionally or alternatively, the use of force upon Plaintiff by Defendants Clardy, Williamson, and Manning was done maliciously, sadistically, and/or or the very purpose of causing harm to Plaintiff.

203. Defendants Clardy, Williamson, and Manning, or any of them, knew or should have known that the excessive physical force used against Plaintiff would result in Plaintiff suffering serious harm.

204. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, Plaintiff was not exhibiting any meaningful physical resistance to said Defendants.

205. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, Plaintiff was restrained to such a degree that even if Plaintiff wanted to, he was physically incapable of meaningfully resisting said Defendants.

206. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, there was no need for the application of such force.

207. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, Plaintiff posed no threat whatsoever to said Defendants' safety.

208. At the time Defendants Clardy, Williamson, and Manning used excessive physical force on Plaintiff, said Defendants did not reasonably perceive Plaintiff as posing some threat warranting the application of force.

209. Defendants Clardy, Williamson, and Manning made no effort to temper the severity of the force they employed.

210. Plaintiff unnecessarily suffered pain and injury as a result of the force used by Defendants Clardy, Williamson, and Manning.

211. In using force against Plaintiff as set forth above, Defendants Clardy, Williamson, and Manning were acting under color of state law in furtherance of assigned duties.

212. Each of the above-described acts in which Defendants Clardy, Williamson, and/or Manning engaged were incidental to some service being performed for his or her employer.

213. Alternatively, each of the above-described acts in which Defendants Clardy, Williamson, and/or Manning engaged arose out of an emotional response to actions being taken for his or her employer.

**WHEREFORE**, for his Eighth Cause of Action, Plaintiff prays for judgment against Defendants Board of County Commissioners of McCurtain County, Oklahoma, Kevin Clardy, Richard Williamson, and Alicia Manning for all available pecuniary and non-economic damages, as well as punitive damages against Defendants Clardy, Williamson, and Manning, in an amount exceeding $75,000.00, or such other specific sum consistent with the evidence that Plaintiff anticipates will be presented in this case. Plaintiff also prays for prejudgment interest, attorney fees, and the costs of this action, to be taxed against Defendants BOCC, Clardy, Williamson, and

Manning, along with an award of all other relief (whether legal, equitable, or both) to which Plaintiff may be entitled and/or that the Court deems just and proper.

Respectfully submitted:

CAMP LAW FIRM

By: _Christopher L. Camp_____
Christopher L. Camp, OBA #18541
7122 South Sheridan Road, Suite #2-382
Tulsa, Oklahoma  74133
Telephone: (918) 200-4871
Facsimile: (918) 340-6799
E-mail: camplawfirm@gmail.com


and

GARRETT LAW

By: /s/ D. Mitchell Garrett, Jr._____
D. Mitchell Garrett, Jr., OBA# 20704
320 South Boston Avenue, Suite 825-G
Tulsa, Oklahoma  74103
Telephone: (918) 221-6190
Facsimile: (918) 340-6799
E-mail: mitchell@garrettlawcenter.com

Attorneys for Plaintiff Roper Harris

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2022, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

Robert S. Lafferrandre, Esq.
Jessica L. Dark, Esq.
Jamison C. Whitson, Esq.
Howard T. Morrow, Esq.

/s/ Christopher L. Camp
**Christopher L. Camp**